

**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Medical Center*

---

**Office of the Warden**

*3301 Leestown Road*
*Lexington, KY 40511-8799*

August 23, 2022

The Honorable Rodney Smith
United States District Judge
United States District Court
Southern District of Florida
U.S. Federal Building and Courthouse
299 East Broward Boulevard, Chambers 202A
Fort Lauderdale, Florida 33301

RE:   Name:     PARKER, Gerald
      Case No.: 0:21-cr-60101-RS-1
      Reg. No.: 43359-509

Dear Judge Smith:

In accordance with your Court Order, a psychological evaluation of
Gerald Parker has been completed pursuant to Title 18, U.S.C.,
§ 4241. A copy of the evaluation is enclosed.

If I can be of further assistance to the Court in this matter, please
do not hesitate to contact myself or the evaluating clinician,
Dr. Haley Wentowski, ███████████. We respectfully submit this
report to the Court.

Sincerely,

David Paul
Warden



**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Medical Center*

3301 Leestown Road
Lexington, KY 40511-8799

## FORENSIC PSYCHOLOGICAL REPORT
## COMPETENCY REPORT PURSUANT TO TITLE 18 U.S.C. § 4241(b)

| | |
|---|---|
| Defendant Name: | Gerald Parker |
| Register Number: | 43359-509 |
| Criminal Case Number: | 0:21-cr-60101-RS-1 |
| Date of Birth: | ███████ |
| Dates of Evaluation: | July 15, 2022 – August 12, 2022 |
| Date of Report: | August 23, 2022 |

### IDENTIFICATION AND REASON FOR REFERRAL

Mr. Gerald Parker is a 79-year-old male who was referred to the Lexington Federal Medical Center (FMC) by the United States District Court for the Southern District of Florida. He is charged with one count of Conspiracy to Commit Mail Fraud and Wire Fraud, two counts of Mail Fraud, five counts of Wire Fraud, one count of Conspiracy to Commit Money Laundering, four counts of Money Laundering, and four counts of Monetary Transactions Using Proceeds of Crime. The referring Court has ordered a psychological evaluation under the provisions of Title 18, U.S. Code, Sections 4241 and 4247. The Court ordered evaluation of Mr. Parker's competency to proceed, specifically whether he is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

### NOTIFICATION OF LIMITS OF CONFIDENTIALITY

Mr. Parker was advised upon his arrival to the Lexington FMC of the purpose of the evaluation and the non-confidential nature of this examination. He was informed that the usual confidential doctor/patient relationship did not exist and that information gathered during the evaluation will be used in a report submitted to the Court and distributed to both the prosecuting and defense attorneys. He was further informed that this writer, as the evaluator, could be subpoenaed at a later date to testify regarding the evaluation. This information was presented to Mr. Parker numerous times throughout the course of the evaluation, and he presented with a sufficient understanding of this notification.

### EVALUATION PROCEDURES

As part of the evaluation process, the following documents were reviewed:
1. Order authorizing present evaluation, dated July 6, 2022
2. Amended Order, filed July 22, 2022

Forensic Psychological Report, Page 2
PARKER, GERALD
Case Number: 0:21-cr-60101-RS-1

3. Motion to Declare Defendant Incompetent to Stand Trial and Request for an Evidentiary Hearing, filed May 25, 2022
4. Government's Response to Motion to Declare Defendant Incompetent to Stand Trial and Request for an Evidentiary Hearing, filed June 8, 2022
5. Reply to Government's Motion to Declare Defendant Incompetent to Stand Trial and Request for an Evidentiary Hearing, filed June 14, 2022
6. Criminal Docket for Case #: 0:21-cr-60101-RS-1, retrieved from PACER on July 15, 2022
7. Indictment pertaining to the alleged offenses, filed March 26, 2021
8. Summary of Interview with Mr. Parker at the United States Attorney's Office on January 24, 2020
9. Summary of Interview with Mr. Parker at the United States Attorney's Office on March 11, 2020
10. Securities and Exchange Commission v. Gerald C. Parker, Consent of Defendant Gerald C. Parker, dated March 6, 2020
11. Huntsville Hospital Records, 40 pages
12. Progress Note by Andrew C. MacDougall, DO, 4 pages
13. Progress Note by Andrew C. MacDougall, DO, 4 pages
14. Palm Beach Gardens Medical Center Records, 84 pages
15. Encompass Health Letter, 2 pages
16. Advocate Health Care Imaging Report, 2 pages
17. Advocate Aurora Health Medical Records, 29 pages
18. LiveWell Appointments and Visits, 2 pages
19. LiveWell Medication List, 3 pages
20. Psychological Evaluation authored by Merry Sue Haber, Ph.D., P.A., dated April 11, 2022
21. United States Marshals Service USM 129 Individual Custody/Detention Report, dated July 14, 2022
22. Various Bureau of Prisons' (BOP) mental health and medical records
23. Telephone calls placed from Mr. Parker's phone account

Additionally, contacts were made with both the Assistant United States Attorney (AUSA) and Defense Counsel to request the above records and to gather information on the reasons for referral. Mr. Parker's attorney provided contact information for Mr. Parker's daughter, Ms. Gilson. This evaluator called her and left a voicemail requesting a return call. Ms. Gilson returned the call; however, this evaluator was unavailable to gather collateral information at the time. This evaluator attempted two times after that to contact Ms. Gilson with no success.

After arriving at Lexington FMC on July 15, 2022, Mr. Parker was routinely observed by correctional and unit team staff and mental health providers. He participated in individual clinical interviews over the course of the evaluation. He was administered the Wechsler Memory Scale—Fourth Edition and the Test of Memory Malingering. Additionally, he placed 11 phone calls during the evaluation period, and all of these calls were reviewed for additional information about his current functioning.

Forensic Psychological Report, Page 3
PARKER, GERALD
Case Number: 0:21-cr-60101-RS-1

## BACKGROUND INFORMATION

The following is based on the self-report of Mr. Parker and the aforementioned documents and sources. This section is not intended to be an exhaustive psychosocial history of the defendant, and the information is limited by the veracity of the sources.

Mr. Parker reported: He was born and raised in Moulton, Alabama. He was born full-term and met his developmental milestones, such as walking and talking, on time. He attended mainstream classes in school and did not repeat any grades. He graduated from high school and subsequently earned a certificate of completion from a business college. He has no history of serving in the United States military or receiving disability payments from the government. He recounted his employment history in great detail and his recollection was largely consistent with the employment history noted in the summary of his interview at the United States Attorney's Office on March 11, 2020. He worked for the Federal Bureau of Investigation (FBI) in fingerprint technology as his first job. He then worked for General Electric in various capacities, to include vice president of the human resources department. Later, he started a company called Credit Information Systems which he ran for 10 years until he sold it to Equifax for $5 million.

He is twice divorced and has fathered three children. He also has one granddaughter. He has no prior mental health history, to include psychiatric hospitalization or participation in outpatient services. He has no history of suicide attempts or engagement in non-suicidal self-directed violence. He has never been prescribed psychiatric medication. He reported in the past he drank alcohol "quite a bit" but denied that it resulted in any problems. He has no history of abusing illicit substances. He has never participated in alcohol or substance abuse treatment.

Regarding medical history, Mr. Parker reported he was relatively healthy until a few years ago. He reported he was walking his dog one morning when he fell and hit his head. He shared he was hospitalized for five days and diagnosed with a concussion and a transient ischemic attack (TIA). He reported he subsequently had two surgeries related to issues with his gallbladder and while recovering from those surgeries, he again fell and hit his head. He indicated at this time he was given a walker to prevent future falls. He also reported he suffered a stroke at his mother's funeral in Huntsville, Alabama. He indicated he spent approximately 20 days at a rehabilitation center then moved in with his daughter. He also reported he attended many medical appointments and was eventually diagnosed with "white matter disease." Mr. Parker shared he is no longer able to drive and relies on his daughter to care for him. He reported he is able to do some tasks for himself, such as cooking and cleaning "a little bit" as well as taking care of their dog.

**Palm Beach Gardens Medical Center Records, 84 pages**
Records from Palm Beach Gardens Medical Center reflect Mr. Parker presented to the hospital in August 2017 for "evaluation of weakness, fever and abnormal gait." He was released from the hospital the same date with the following impressions documented: bilateral community-acquired pneumonia; fever—resolved; leukocytosis; mild metabolic encephalopathy—resolved; and history of heavy alcohol use.

Forensic Psychological Report, Page 4
PARKER, GERALD
Case Number: 0:21-cr-60101-RS-1

Mr. Parker was admitted to the hospital on October 26, 2018 after he had fallen earlier in the day. He had sought medical treatment at a different facility and was discharged home; however, he continued to experience weakness, so his family had him transported to the hospital. Findings from a CT scan state: "Atrophy and periventricular white matter disease identified." He was discharged from the hospital on October 29, 2018, with discharge diagnoses of encephalopathic state, multifactorial; transient ischemic attack; fever of unknown etiology, rule out sepsis; status post recent fall; and right upper extremity fracture.

He again presented to the hospital in May 2019 due to experience of upper abdominal pain with nausea and vomiting. He was diagnosed with gallstone pancreatitis. He underwent two surgeries: one to remove gallstones and another to remove his gallbladder.

**Advocate Aurora Health Medical Records, various dates, 29 pages**
Advocate Aurora Health medical records provide diagnoses of hyperlipidemia; low vitamin D level; pulmonary granuloma; tremor; fall, sequela; gait difficulty; cerebrovascular disease; hyperglycemia; bilateral hearing loss, unspecified hearing loss type; memory changes and transient ischemic attack. Results of a MRI of Mr. Parker's brain, dated July 8, 2020, states: "Extensive chronic small vessel ischemic disease is present." A progress note from July 29, 2020, reflects Mr. Parker reported having an abnormal gait and imbalance for the last year as well as memory and cognitive changes and occasional word-finding difficulties.

**Huntsville Hospital Records, 40 pages**
Documentation from Huntsville Hospital, dated February 28, 2021, reflects the following discharge diagnoses: stroke, dysarthria, weakness of right arm, hyperlipidemia, expressive aphasia, and patent foramen ovale.

**Encompass Health Letter, dated April 12, 2021, 2 pages**
Keith Anderson, DO, of Encompass Health, wrote a letter, dated April 12, 2021, advising Mr. Parker was a patient of the rehabilitation hospital from March 8, 2021, through March 19, 2021, and was diagnosed with a cerebrovascular accident (CVA). He documented: "Mr. Parker needs supervision for daily activities including dressing, toileting, hygiene needs, transfers, ambulating, and he needs assistance with finances, medication administration, and transportation."

**Advocate Health Care Imaging Report, dated June 18, 2021, 2 pages**
Results of the MRI state: "No acute findings. Severe chronic microvascular ischemic changes of cerebral white matter can be related to chronic hypertension."

**Progress Note by Andrew C. MacDougall, DO, dated June 23, 2021, 4 pages**
A progress note authored by Dr. MacDougall notes Mr. Parker is unable to drive and manage money. His short-term memory is described as "poor." The note further reflects the results of a MRI brain scan were "consistent with vascular dementia." Dr. MacDougall also documented: "His cognition is severely impaired and this is likely due to the profound white matter disease and multiple old infarcts on his brain MRI...he is likely to slowly worsen with time although the initiation of medications (statin, anticoagulation, donepezil) may slow progression." The following are listed as active problems: transient ischemic attack, pulmonary granuloma, low

Forensic Psychological Report, Page 5
PARKER, GERALD
Case Number: 0:21-cr-60101-RS-1

vitamin D level, hyperlipidemia, vertebrobasilar dolichoectasia, tremor, recurrent falls, cerebrovascular small vessel disease, carotid artery stenosis, aneurysm of ascending aorta, vitamin D deficiency, impaired glucose fasting, vascular dementia, cerebrovascular accident due to bilateral embolism of middle cerebral arteries, and intracranial atherosclerosis. He was prescribed Eliquis, Atorvastatin, vitamin D, and Donepezil.

**Progress Note by Andrew C. MacDougall, DO, dated October 19, 2021, 4 pages**
A second progress note by Dr. MacDougall reflects Mr. Parker reported "no new significant changes" since they last met. The doctor increased his prescriptions for Donepezil and Atorvastatin. He documented Mr. Parker did not need to drive and recommended Mr. Parker utilize a walker or cane at all times and not be left at home alone.

**LiveWell Medication List, 3 pages**
A medication list from LiveWell indicates Mr. Parker was prescribed Donepezil, Atorvastatin, Eliquis, and cholecalciferol.

**Psychological Evaluation authored by Merry Sue Haber, Ph.D., P.A., dated April 11, 2022**
Mr. Parker was evaluated by Dr. Haber at the request of Mr. Parker's attorney. Dr. Haber diagnosed Mr. Parker an unspecified major neurocognitive disorder and opined: "Gerald Parker cannot consult with his attorney and cannot testify as to the charges against him due to his Major Neurocognitive Disorder and Dementia which are progressive and incurable, and which affect his memory and other brain functions. He will never achieve Competency."

**<u>COURSE OF EVALUATION</u>**
Mr. Parker was screened by this evaluator upon arrival to the institution on July 15, 2022. He endorsed anxiety related to "being here." He did not appear to be in acute distress nor did he exhibit signs of psychosis. He identified his attorney believed he was "incapacitated" and understood he was at the facility for an evaluation. He discussed he had a previous evaluation with "Dr. Haber, I think." Mr. Parker was cleared from a psychological perspective to be housed in general population following completion of a precautionary quarantine to prevent the spread of Coronavirus 2019 (COVID-19). This evaluator spoke with him briefly cell-side during his quarantine on July 18, 2022. Mr. Parker recognized this evaluator and stated, "Aren't you the one who met with me on Friday?" He inquired what the current date was, and he incorrectly reported he arrived to the institution on July 14th. He also inquired if his MRI results had arrived for this evaluator's review.

Upon completion of the quarantine on July 19, 2022, Mr. Parker was assigned quarters in an unlocked room on a general population unit. Of note, this evaluator's office is located on the same unit, allowing for frequent observations of Mr. Parker in between scheduled interviews. He arrived early for all of his scheduled appointments with this evaluator.

Mr. Parker managed funds in his inmate commissary account for purchase of food items, soda, coffee, and hygiene items. He also utilized his inmate phone account to place 11 phone calls to his daughter, totaling approximately one hour and 28 minutes. All 11 calls were reviewed by this evaluator. Of note, Mr. Parker arrived to the institution with his daughter's phone number written

Forensic Psychological Report, Page 6
PARKER, GERALD
Case Number: 0:21-cr-60101-RS-1

on his arm, and it had washed off by the time he was released from quarantine and was able to make phone calls. As a result, this evaluator provided Mr. Parker with his daughter's phone number, as provided by his attorney. This evaluator also asked another pre-trial defendant to assist Mr. Parker in setting up his phone account, as most individuals incarcerated for the first time require some level of assistance in learning how to utilize the phone system.

The content shared by Mr. Parker on the phone was coherent and logical. His thoughts were well-organized and devoid of delusional thought content. There were no indications of deficits in social functioning. A review of Mr. Parker's phone calls provided additional information on his current cognitive functioning, to include his memory. While on the phone, he asked an inmate for instructions about how to put money on his inmate account, and he relayed the information to his daughter. It is not unusual for defendants who have not been previously incarcerated to ask for assistance in explaining to their family members how to add money to their account.

He often shared information provided to him by this evaluator with his daughter. Although he sometimes seemed to become confused about the date, his dissemination of information was otherwise largely accurate. For example, this evaluator advised him she had received the MRI results in the mail from his daughter and would call his daughter in the coming days. Later in a phone call, he accurately relayed the same information to his daughter. He also accurately informed her that his evaluation would end on August 12th.

He correctly described various aspects of the institution, such as the unit having an outdoor courtyard and that his assigned unit was "like an old folks' home." Of note, Mr. Parker was housed on a medical unit where many elderly and disabled inmates are housed. One evening, he told his daughter he purchased multiple hygiene products at the inmate commissary, and a review of his commissary purchase sheet reflected he purchased various hygiene products earlier in the day. He shared information about his meetings with staff in other departments, such as Health Services, and a review of documentation authored by Health Services staff was consistent with his dissemination of information. For example, he discussed receiving medical shoes and subsequently being able to walk to the dining hall without his walker. In the beginning of August, he began asking his daughter if his money had been deposited so that she could pay bills. In one call, he informed his daughter that if he did not spend all of his money on commissary prior to departing from the institution, it would be given to him when he left the institution.

Following administration of psychological testing on August 2, 2022, Mr. Parker placed a phone call to his daughter, and he stated, "She's certainly not going to prove that I'm competent." Three days later, during a phone call, he stated, "I think we're okay with her. I think she knows. She gave me a lot of tests and all that stuff and I didn't pass any of them."

**Mental Status Exam (MSE) and Current Functioning**
While at FMC Lexington, Mr. Parker's hygiene and grooming were overall good. Of note, during an interview on July 21, 2022, he presented as malodorous and it appeared he had urinated on himself. He indicated he had not yet been to laundry to retrieve clothing, and this evaluator asked another pre-trial defendant to assist him in navigating to the laundry department.

**Sensitive but Unclassified**

Forensic Psychological Report, Page 7
PARKER, GERALD
Case Number: 0:21-cr-60101-RS-1

After this, he always presented with good hygiene. He initially ambulated with the assistance of his walker; however, for the majority of the evaluation, Mr. Parker navigated the institution successfully without the assistance of a walker. This included walking approximately one-tenth of a mile to the dining hall three times per day and climbing a flight of stairs to reach this evaluator's office. This evaluator offered on several occasions to meet with Mr. Parker in an office on the first floor if he felt he was unable to ambulate up the stairs; however, Mr. Parker indicated he was able to climb them and declined offers to meet on the first floor. Multiple times, he indicated he was proud of himself for how much and how often he was walking.

Mr. Parker remained alert and attentive with appropriate eye contact. He was generally oriented to person, place, time, and situation. He was polite, pleasant, and respectful during interviews. Mr. Parker presented as content with a congruent affect. He did not present with psychomotor agitation or retardation. He demonstrated sufficient attention and concentration, requiring no prompts to redirect his attention.

Mr. Parker's speech was generally of an appropriate rate and tone. He occasionally evidenced minor delays in responding. This only caused brief delays in the flow of conversation. On one occasion, Mr. Parker twice used incorrect words. For example, he referred to his living area as his "office" and when referring to his daughter, he mistakenly called her his wife. This had a minimal impact on his overall ability to communicate effectively, and despite using the wrong words, this evaluator was still able to discern what he meant to say based on the context of the conversation. Mr. Parker's thought processes were organized and goal-directed. Thought content was absent of delusions. At no point did he appear to be distracted by or responding to internal stimuli. Mr. Parker did not display any disorganization, bizarre behavior, unusual mannerisms, or confusion characteristic of a psychotic disorder. He was never observed to speak to himself during lulls in conversations with this evaluator, nor did he ever appear distracted by, or as though he was responding to, internal stimuli. He did not present with a constellation of symptoms suggestive of a manic or hypomanic episode, such as clinically significant mania or irritability, pressured speech, or signs of grandiosity. There was no indication of suicidal or homicidal ideation, plan, or intent during the evaluation period.

Regarding current mental health symptoms, Mr. Parker described worrying about his deteriorating health and his daughter as well as the resolution of his case. When asked if he ever feels sad or depressed, he stated, "I'm sure I do sometimes." He reported no issues with his appetite and indicated he slept well each night. He described his concentration as "terrible" and elaborated about how sometimes he is able to remember things and other times he is unable. He also indicated having difficulty navigating the institution independently, although he noted he asks other people for assistance when having to go to an unfamiliar area. Mr. Parker explicitly denied suicidal and homicidal ideation, plan, and intent. He reported no experience, past or present, of perceptual disturbances to include auditory and visual hallucinations.

Mr. Parker also referenced memory issues throughout the evaluation period. He reported his memory is better some days compared to others. As a result, this evaluator met with Mr. Parker multiple times each week at different times of the day to assess for any differences in his cognitive functioning. Although Mr. Parker's recent medical issues have resulted in a decrease in

Sensitive but Unclassified

Forensic Psychological Report, Page 8
PARKER, GERALD
Case Number: 0:21-cr-60101-RS-1

his cognitive functioning compared to a previous level of performance, his short and long-term memory were consistently observed to be largely intact. Mr. Parker was able to discuss historical information about himself in detail, and the information he provided was consistent with information available in collateral sources of information. He also shared information which occurred more recently but prior to the start of the evaluation. For example, he discussed that his attorney told him he never requests competency evaluations and that the prosecutor was on maternity leave when his attorney filed the motion. This information is consistent with what is stated in a motion filed by his attorney.

He also demonstrated the ability to remember recent events and newly acquired information. For example, he shared information with this evaluator about his meetings with Health Services staff which was consistent with documentation by Health Services staff, such as his request for a wheelchair and soft shoes. He also tracked information across and within interviews. For example, on July 27, 2022, he discussed how if he is sentenced to probation, he would attempt to obtain a job at Wal-Mart as a door greeter. Two days later, he again referenced his plan while noting he knew he had shared his plan with this evaluator previously. He also accurately shared information provided to him by his daughter via the phone, such as her plan to rent a hotel room in Lexington the night prior to his departure from the institution.

**Medical Evaluation and Treatment**
During the course of the evaluation, Mr. Parker was assessed by Health Services staff. A routine comprehensive medical history and a physical examination with laboratory work was completed as part of standard intake protocol. He arrived with the following prescriptions which were continued: five milligrams of Apixaban every 12 hours and 10 milligrams of Atorvastatin each evening for an indication of cerebrovascular disease, unspecified, and 10 milligrams of Donepezil daily for an indication of "unsp[ecified] symptoms and signs w[ith] cognitive functions and awareness." Documentation dated July 25, 2022, reflects Mr. Parker presented to sick call requesting medical shoes due to difficulty walking in the standard work books and a wheelchair. Documentation further states: "Upon assessment IM [inmate] is safe ambulating with walker and educated on why a wheelchair would not benefit him. IM also C/O [complains of] having a blister on toe. Band-Aids given. IM needs alternate shoes to continue walking safely. Spoke with PT [physical therapy] they will give him medical shoes today." On August 1, 2022, he was prescribed carbamide peroxide drops for an indication of impacted cerumen.

**Psychiatric Treatment**
Mr. Parker arrived without prescription for psychiatric medication, and he was not prescribed psychiatric medication during the course of the evaluation.

**PSYCHOLOGICAL TESTING**
**Wechsler Memory Scale—Fourth Edition (WMS-IV)**
Mr. Parker was administered the Wechsler Memory Scale—Fourth Edition (WMS-IV) on August 2, 2022. The WMS-IV is an individually administered battery designed to assess various memory and working memory abilities in individuals ages 16-90. Mr. Parker appeared to put forth variable effort during administration of the WMS-IV. Scores from subtests which required writing were also likely negatively impacted due to Mr. Parker's difficulty in writing as a result

**Sensitive but Unclassified**

Forensic Psychological Report, Page 9
PARKER, GERALD
Case Number: 0:21-cr-60101-RS-1

of his medical issues. These factors, paired with the results of the TOMM (discussed further below), indicate the results of the WMS-IV are not considered an accurate measure of his current memory abilities.

In older adults, the WMS-IV yields four index scores. Scores of 100 are considered average, with 68% of people scoring between 85 and 115. The Auditory Memory Index (AMI) indicates an individual's ability to remember orally-presented information. Mr. Parker earned an index score of 74 on the AMI, placing him in the borderline range. The Visual Memory Index (VMI) assesses an individual's ability to remember visually-presented information. He earned an index score of 50 on the VMI, placing him in the extremely low range. The Immediate Memory Index (IMI) measures an individual's ability to remember both visually- and orally-presented information immediately after it is presented. He earned an index score of 65 on the IMI, placing him in the extremely low range. The Delayed Memory Index (DMI) indicates an individual's ability to remember both visually- and orally-presented information after a 20-30 minute delay. Mr. Parker earned an index score of 65 on the DMI, placing him in the extremely low range. As aforementioned, these results are not considered to be an accurate measure of his current memory abilities.

**Test of Memory Malingering (TOMM)**
Mr. Parker was administered the Test of Memory Malingering (TOMM) on August 2, 2022. The TOMM is a 50-item recognition test which provides a systematic method to assist in discriminating between bona fide memory impairment and feigned cognitive deficits. It consists of two learning and recognition trials and an optional retention trial after a brief delay. Typically, scores on the second and retention trials are very high for non-malingerers, regardless of age, neurological impairment, or psychological symptoms. Validation studies suggest even individuals with traumatic brain injury, cognitive impairment, aphasia, and dementia will achieve scores above chance (e.g. score 25 or higher out of 50) on any trial.

Mr. Parker scored 26 points on Trial 1, 25 points on Trial 2, and 27 points on the Retention Trial. His scores raise concern that he was not putting forth maximum effort and is possibly malingering memory deficits. His results also raise serious questions about his motivation to perform well on other tests, such as the WMS-IV, and call into question the validity of results of other tests.

**ABILITIES RELEVANT TO COMPETENCY**
The Revised Competency Assessment Instrument (RCAI) was utilized as a structured interview of competency-related issues. This instrument assesses areas including, but not limited to, an individual's understanding of charges, understanding roles and functions of courtroom participants and proceedings, appreciation of penalties, ability to cooperate with counsel, and capacity to engage appropriately in the court proceedings.

Mr. Parker reported he is charged with "two or three counts of mail fraud." This evaluator inquired what others charges he has, and he stated, "That's it but that equals a lot of time if you're found guilty, and remember this was six years ago." Each of his charges were reviewed individually. Mr. Parker appeared to understand the allegations, as evidenced by disputing some

Sensitive but Unclassified

Forensic Psychological Report, Page 10
PARKER, GERALD
Case Number: 0:21-cr-60101-RS-1

of the charges and providing an alternative explanation for what transpired. He identified if found guilty, he may be sentenced to "probably 12 years" and noted such would be a life sentence for him. He understood if probation was part of his sentence, he would have to abide by "whatever the terms would be."

Mr. Parker understood the various roles of courtroom participants. He identified his attorney's job is to keep him out of jail by "prov[ing] to them what I'm saying to you." He reported the prosecutor's job is to "get me any way she can." He identified a Judge sentences defendants who are found guilty. He reported a jury's role is "to review all the evidence presented and come up with a guilty or not guilty verdict." He identified himself as the defendant. He reported a witness' role is "to testify." Mr. Parker demonstrated an understanding of evidence. When asked for examples of what kind of evidence may be used in his case, he discussed how "everything," to include paperwork, was seized from "the office."

Mr. Parker explained not guilty meant "prove it" and guilty meant "you actually did what they said, what's charged." He was provided education on a not guilty by reason of insanity defense, and he indicated he understood. He defined a plea bargain as "where you negotiate a deal." He indicated he was unsure whether the deal was negotiated with the prosecutor or the Judge but noted his attorney would know. He understood a defendant enters a guilty plea when accepting a plea bargain. He also understood a defendant forfeits their right to a trial when accepting a plea bargain. Mr. Parker expressed a willingness to consider a plea bargain depending upon the stipulations of it.

Mr. Parker understood defendants are not required to testify but was unsure why. He was provided education on his Fifth Amendment rights. He discussed how his case was set for trial and expressed uncertainty about his ability to testify as a witness. He stated, "Some days I can remember things and some days I can't and if I'm under stress it would be even worse." He also noted, "They'd be better off to cut me a deal." He was provided education on the process of direct and cross examination. He understood that should he testify, he would be expected to tell all of the facts to the best of his ability. He expressed a willingness to listen to his attorney's advice regarding whether he should testify.

Regarding appropriate courtroom behavior, Mr. Parker identified he should be "professional at all times" while in the courtroom. He reported he was unsure when he could speak, and he was provided education. He expressed a willingness to notify his attorney if he did not understand what a witness was saying or if a witness told a lie about him. He answered affirmatively when asked if he anticipates there may be witnesses who would lie about him, and he identified specific individuals listed on his indictment who he believes would lie. He identified if he spoke out or moved about the courtroom without permission, it "wouldn't be good." He was provided education on specific, potential consequences, and when asked again on a later date, he identified he could be "warned" and/or charged with "contempt of court." Mr. Parker denied prior difficulty conducting himself properly in the courtroom, and he denied anticipating any future difficulty.

Sensitive but Unclassified

Forensic Psychological Report, Page 11
PARKER, GERALD
Case Number: 0:21-cr-60101-RS-1

Mr. Parker identified his attorney by first and last name. He understood the concept of confidentiality between himself and his attorney. He expressed he has confidence in his attorney and explained, "Basically he seems to have the—to have my interest in mind and he's the one who got the Court to hire that gal, the doctor." He reported no disagreement with the way his attorney has handled his case thus far. He indicated he was unsure what to do should he disagree with his attorney in the future, and he was provided education.

Mr. Parker identified he previously assisted his attorney by giving him "everything" when he was first appointed. He added, "Now I'm not capable of helping him too much. I'll do what I can." He reported he "sometimes" remembers what transpired during the timeframe of the alleged offenses. He indicated he anticipates difficulty assisting his attorney depending upon the day and expressed some days he is unable to "even remember some of the people involved." This evaluator inquired if it would help jog his memory if his attorney provided the names of individuals involved should he be unable to remember, and Mr. Parker responded, "It might, yeah." Given that Mr. Parker voiced concerns about his ability to assist his attorney, this evaluator engaged Mr. Parker in discussions pertaining to the allegations on at least three occasions. Although it appears Mr. Parker is unable to remember details of the allegations to the extent he would prefer, there was no significant deficit noted in his ability to discuss his case. He generally understood the allegations against him and was able to discuss his alleged role. He also disputed some of the allegations against him and provided his version of events. Additionally, he recalled information from when a search warrant was executed and he subsequently spoke with law enforcement. In sum, Mr. Parker has the ability to rationally assist his attorney should he choose to do so.

## DIAGNOSTIC IMPRESSION
The following diagnostic impression is offered in accordance with the criteria set forth in the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (*DSM-5*). This diagnosis is offered with the acknowledgement that this evaluator is not a neuropsychologist and is not trained specifically in neuropsychology.

Mild Vascular Neurocognitive Disorder

Mr. Parker is diagnosed with a mild vascular neurocognitive disorder (NCD). A diagnosis of mild neurocognitive disorder is given when there is evidence of modest cognitive decline from a previous level of performance in one or more cognitive domains based on concern of the individual, a knowledgeable informant, or the clinician that there has been a mild decline in cognitive function; and a modest impairment in cognitive performance, preferably documented by standardized neuropsychological testing or, in its absence, another quantified clinical assessment. The cognitive deficits do not interfere with capacity for independence in everyday activities, but greater effort, compensatory strategies, or accommodation may be required in completing complex instrumental activities of daily living, such as paying bills or managing medications. In order for criteria for a mild neurocognitive disorder to be met, the cognitive deficits do not occur exclusively in the context of a delirium and are not better explained by another mental disorder.

Sensitive but Unclassified

Forensic Psychological Report, Page 12
PARKER, GERALD
Case Number: 0:21-cr-60101-RS-1

Mr. Parker reported a decline in functioning after he suffered strokes. He also reported he was diagnosed with "white matter disease." His report of these conditions and subsequent decline is corroborated by multiple collateral records. His cognitive deficits do not interfere with capacity for independence in everyday activities. For example, Mr. Parker was responsible for self-administering most of his medications throughout the evaluation period and at one point, he advised this evaluator he had ran out. A review of his electronic medical record reflected a refill was available, and this suggests he had been taking his medication as prescribed. Additionally, although it appears his daughter is responsible for managing finances, a review of Mr. Parker's phone calls reflected he is still cognizant of bills and when they are due, as evidenced by him asking his daughter if his money had been deposited in his account at the start of the month. He also managed money on his inmate commissary account during the evaluation period and understood that what he did not spend by the day he left the institution would be returned to him. Mr. Parker's deficits are longstanding and not occurring exclusively in the context of a delirium. Additionally, they are not better explained by another mental disorder.

When an individual is diagnosed with a vascular NCD, the clinical features are consistent with a vascular etiology, as suggested by either of the following: onset of the cognitive deficits is temporally related to one or more cerebrovascular events or evidence for decline is prominent in complex attention (including processing speed and frontal-executive function). There must be evidence of the presence of cerebrovascular disease from history, physical examination and/or neuroimaging considered sufficient to account for the neurocognitive deficits. Lastly, the symptoms cannot be better explained by another brain disease or systemic disorder. Available information reflects Mr. Parker's cognitive decline was temporally related to suffering strokes. Regarding evidence of the presence of cerebrovascular disease, for individuals with a mild vascular NCD, history of a single stroke or extensive white matter disease is generally sufficient. Collateral records reflect Mr. Parker has suffered strokes and has white matter disease. Additionally, his symptoms are not better explained by another brain disease or systemic disorder.

Malingering was also considered as a potential focus of clinical attention. Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms for external incentives, such as avoiding work or evading criminal prosecution. It is this evaluator's opinion that Mr. Parker feigned memory deficits during psychological testing, and a review of his phone calls reflected he hopes to be found incompetent to proceed. Despite this desire, during legally-focused discussions, he was generally open and candid with this evaluator about his legal case, and such discussions reflected a largely intact memory. He did not appear to embellish or exaggerate his current deficits during legally-focused discussions in an effort to be found not competent to proceed. Given his sufficient effort during these discussions, he does not meet the threshold necessary to be considered malingering.

## OPINION REGARDING COMPETENCY TO PROCEED

Based on the available information, in the opinion of this evaluator, Mr. Parker is currently suffering from a mental disease or defect, that being a mild vascular neurocognitive disorder. However, the symptoms of this disorder are not rendering him mentally incompetent to the extent he is unable to understand the nature and consequences of the proceedings against him or

Forensic Psychological Report, Page 13
PARKER, GERALD
Case Number: 0:21-cr-60101-RS-1

properly assist in his defense. He presented with a reasonable degree of factual and rational understanding of the legal proceedings and has a sufficient ability to consult with counsel should he choose. Thus, in the opinion of this evaluator, Mr. Parker is currently competent to proceed.

## PROGNOSIS AND RECOMMENDATIONS
The course of a vascular neurocognitive disorder may vary from acute onset with partial improvement to stepwise decline to progressive decline with fluctuations and plateaus of varying lengths. Absent any additional medical events, no short-term change in Mr. Parker's mental stability and ability to participate meaningfully in his defense is anticipated.

Respectfully Submitted,

Haley Wentowski, Psy.D.
Forensic Psychologist