FD-302 (Rev. 5-8-10)

-1 of 10-



# FEDERAL BUREAU OF INVESTIGATION

Date of entry  04/08/2020

GERALD C. PARKER ("PARKER"), date of birth ▮▮▮▮▮▮▮, Social Security Account Number ▮▮▮▮▮▮▮, residential address ▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮, telephone number ▮▮▮▮▮▮▮, was interviewed on 03/11/2020 at the United States Attorney's Office in Miami, Florida. Also present during the interview were Economic Crimes Deputy Chief Harry Shimckat and Assistant United States Attorney (AUSA) Elizabeth Young. PARKER's defense counsel Israel Encinosa was also present during the interview. The interview was conducted pursuant to a Kastigar letter. After being advised of the identity of the interviewing officials and the nature of the interview, PARKER provided the following information:

### Parker's Background

PARKER grew up in a farm in Alabama. PARKER graduated from Hatton high school and went to work with the Federal Bureau of Investigation (FBI) right after graduating high school. PARKER began working with the FBI in 1961. At the time, PARKER was 18 years old. PARKER's job with the FBI was as a fingerprint technician. The FBI had drawers with millions of fingerprints and PARKER's job was to get the fingerprints and count the loops. PARKER's cousin also worked for the FBI and retired as a Special Agent. PARKER worked for the FBI for two years.

In or around 1963, PARKER went to work for General Electric in Huntsville, Alabama in their security department. PARKER did background checks and handled the security clearances for General Electric. At the time, General Electric was handling the "Apollo Project" and the company was dealing with classified information.

Around 1968, PARKER transferred to Phoenix, Arizona to handle human resources for the mission and space division of General Electrics. PARKER received an award for his performance and eventually became the head of the

---

Investigation on  03/11/2020  at  Miami, Florida, United States (In Person)

File #  318B-MM-2137495                                           Date drafted  03/12/2020

by  Kelvin A. Ortiz, MIS JAMES MICHAEL

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

318B-MM-2137495

Continuation of FD-302 of (U) Interview of Gerald C. Parker on 03/11/2020 , On 03/11/2020 , Page 2 of 10

General Electric human resources department in Phoenix. PARKER worked in Phoenix from 1968 to 1969. PARKER's boss went to Dallas and recruited PARKER to set up the human resources department for a public company named UNIVERSITY COMPUTING. PARKER also did mergers and acquisitions for the company. PARKER stayed in Dallas for less than two years. PARKER then transferred to the Chicago office of UNIVERSITY COMPUTING.

PARKER left UNIVERSITY COMPUTING to work for the consumer reporting agency TRANS-UNION as vice-president of sales and marketing. PARKER remained in this position for three years. PARKER explained that the company changed his commission plan and he was making more money than the Chief Executive Officer (CEO).

In or around 1975, PARKER formed a company named CREDIT INFORMATION SYSTEMS. PARKER had this company for 10 years. PARKER sold the company to Equifax for $5 million dollars.

PARKER did not do anything else until 1985 or 1986. PARKER started investing in startup companies. PARKER learned how to manage these investments. PARKER has continued investing in startup companies for the rest of his life.

### Inktomi

PARKER was a founder of INKTOMI. In or around 1995, PARKER and ▮▮▮▮ ▮▮▮▮ decided to start an online search engine. ▮▮▮ resided in Clearwater, Florida. PARKER and ▮▮▮ had been working together with acquisitions and investments. ▮▮▮ had no expertise with respect to building online search engines. Both of them spoke with software companies to create the search engine. They went to Atlanta and met with a guy to discuss the online search engine. However, the guy could not say how much creating the online search engine would cost. The guy from Atlanta gave PARKER the number for ▮▮▮▮▮▮▮▮ who was a professor at Berkeley. PARKER spoke with ▮▮▮▮ on the phone and ▮▮▮ mentioned that he had a PhD student. PARKER, ▮▮▮▮▮ met at the San Francisco airport and drafted a founder's agreement on a napkin. PARKER and ▮▮▮ came back to Clearwater and an attorney from Tampa named ▮▮▮▮▮▮▮▮▮ drafted a founder's agreement. ▮▮▮ brought two additional investors and PARKER brought a third investor named ▮▮▮▮▮▮▮▮▮▮▮ It was decided to

318B-MM-2137495

Continuation of FD-302 of (U) Interview of Gerald C. Parker on 03/11/2020 , On 03/11/2020 , Page 3 of 10

split everything six ways. PARKER was never on the board of INKTOMI. PARKER provided a short term loan of $500,000 to INKTOMI and got paid back for the loan in six months. PARKER considered the loan an investment. The $500,000 was the extent of PARKER's involvement with INKTOMI. At the time of his investment, the company had already been named INKTOMI. The reason why PARKER gave INKTOMI a loan was because the company needed money to buy equipment. The founder's agreement also said that PARKER owned 17.8% of the INKTOMI Initial Public Offering (IPO). However, PARKER's $500,000 loan was separate from the founder's agreement. PARKER stated that the attorney cannot find the INKTOMI founders agreement. PARKER also said that there were two funds in San Francisco that invested $40 million dollars in INKTOMI. PARKER has not talked to [redacted] in years. [redacted] eventually moved to California.

PARKER's big mistake was to sell the stock he owned. Specifically, in or around 1995 or 1996, PARKER sold some of the stock through a private transaction before the INKTOMI IPO. PARKER sold the stock to people that he knew. The law firm of WILSON SANSONE ("SANSONE") assisted the buyer during the private transaction. PARKER did not clear the sale of his stock with [redacted]

GOLDMAN SACHS handled the INKTOMI IPO. The stock was priced at $16.50 but the price jumped to $65.00 the first day of the IPO. Within days after the IPO, the stock went up to $120.00. INKTOMI also did two forward stock splits. PARKER sold the rest of his shares in the market and made between $20 to $30 million dollars from the sale of his shares post-IPO. The funds were in PARKER's Web-Bush Morgan personal account since the stock was under his named. This occurred in the late 90's. As far as PARKER knew, he paid taxes. From the earnings, PARKER invested some of the money and spent the rest. PARKER did not move any of the money to offshore accounts. PARKER used the money to buy airplanes and to travel to the Bahamas. PARKER also bought two to three beach front properties in the Bahamas around an area known as Treasure Key. The properties were purchased under his name. PARKER was still residing in Clearwater during this time. PARKER sold the Bahamas properties years ago. PARKER also opened a charter airline but this business venture did not work. PARKER indicated that the charter airline flew anywhere from the Miami and Fort Lauderdale airports. PARKER had this company for two to

FD-302a (Rev. 5-8-10)

318B-MM-2137495

Continuation of FD-302 of (U) Interview of Gerald C. Parker on 03/11/2020 , On 03/11/2020 , Page 4 of 10

three years, but did not remember the name of the business.

### Parker's Judgment in North Dakota

PARKER had a $31 million dollar judgment in North Dakota. PARKER explained that this occurred as a result of his employment with a company named ▮▮▮▮. PARKER worked for ▮▮ as a consultant. ▮▮▮▮ was already working for ▮▮ but not as a lawyer. ▮▮▮ was a lawyer in Kentucky, but was not licensed to practice law in Florida. PARKER knew ▮▮▮ because he was in-house counsel for a company that PARKER acquired 20 years ago.

PARKER worked for ▮▮ for six to seven months before the lawsuit. The CEO of ▮▮ raised money and invested the money. Everyone in the company got sued since it was a class action lawsuit. The lawsuit claimed fraud and PARKER did not know why he got sued. PARKER has not paid nothing towards the $31 million dollar judgment. No money has been taken from his taxes to satisfy the judgment. According to PARKER, the case is "closed. Look it up." PARKER explained that the case was 11 to 12 years ago and his assumption was that there was a statute limitation that caused the $31 million dollar judgment to be erased.

Everyone at SOCIAL-VOUCHER knew about his judgment because PARKER explained it to them. PARKER explained that an individual named ▮▮▮▮ loaned him $150,000 and his financial advisor later called the State of North Dakota to report PARKER. As a result, SOCIAL-VOUCHER did a rescission and paid a $100,000 fine to the State of North Dakota. ▮▮▮ did not want his money back and later invested more money in SOCIAL-VOUCHER. ▮▮▮ has since passed away.

### Social Voucher.com, Inc.

PARKER did not remember how he made money during the period of 2007 to 2013. Prior to starting with SOCIAL VOUCHER.COM INC ("SOCIAL -VOUCHER",), PARKER was an officer for the company RENEWABLE ENERGY. PARKER hired an individual named ▮▮▮▮▮ as the CEO of the ▮▮▮▮. PARKER also had another company named ▮▮▮▮▮ which he considered his investment company. The people in Nebraska also brought ▮▮▮▮ to the lawsuit.

318B-MM-2137495

Continuation of FD-302 of (U) Interview of Gerald C. Parker on 03/11/2020 , On 03/11/2020 , Page 5 of 10

PARKER formed SOCIAL-VOUCHER in 2013. The idea to form SOCIAL-VOUCHER came from MICHAEL GRIMALDI or ASSENZA (hereinafter referred to as "GRIMALDI"). Back in 2013, PARKER did not know GRIMALDI but had heard his name. PARKER and GRIMALDI got together and GRIMALDI explained that he had the idea to start a company involving an "app" and wanted to know what PARKER was doing. GRIMALDI needed a "front man," and approached PARKER to be the CEO and Chairman of SOCIAL-VOUCHER. GRIMALDI never said why he was using the last name GRIMALDI as opposed to ASSENZA. PARKER knew early on about GRIMALDI's past. Specifically, PARKER and ▓▓▓▓▓▓▓▓▓▓ looked up GRIMALDI and learned that GRIMALDI had been convicted for securities fraud. PARKER came to realize that GRIMALDI did not want to use ASSENZA because of his past problems.

PARKER spoke to GRIMALDI about what he had learned about GRIMALDI, and GRIMALDI told PARKER a story about him being involved with the burning of a building. PARKER knew the owner of the building and his name was ▓▓▓▓ Last Name Unknown (LNU). PARKER was worried but at this point he was already too deeply involved. GRIMALDI also told PARKER that he had set up a company under his wife's name. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

GRIMALDI and PARKER met a few times to discuss the SOCIAL-VOUCHER idea. Their agreement was for PARKER to have a consulting agreement and receive $20,000 to $25,000 a month. GRIMALDI was also receiving the same. When asked where was the money to pay for the salaries coming from, PARKER responded it was all coming from the investors. GRIMALDI had a consulting company under his ▓▓▓▓▓▓▓▓▓. GRIMALDI also did all the marketing materials for SOCIAL-VOUCHER.

PLATINUM TECHNOLOGY CONSULTING INC. ("PLATINUM TECHNOLOGY") was PARKER's company. PARKER indicated that he loaned $2.5 million dollars to SOCIAL-VOUCHER. PARKER explained that his contribution to SOCIAL-VOUCHER occurred by PARKER selling his SOCIAL-VOUCHER shares. PARKER explained that he put six million SOCIAL-VOUCHER shares under his company PLATINUM TECHNOLOGY. PARKER then sold the PLATINUM TECHNOLOGY shares to investors and used the money to pay for the SOCIAL-VOUCHER expenses. Other than selling his shares, PARKER acknowledged that he did not put any money into SOCIAL-VOUCHER. PARKER also acknowledged that all the money that came in to SOCIAL-

VOUCHER was from investors.

PARKER never told anyone that he was not getting paid or earning a salary. When asked again if this information was accurate, PARKER responded that he did tell one of the "FBI guys" that he was not earning a salary. PARKER did not remember if he told anyone else that he was not earning a salary, but it was possible he did. PARKER spoke with the investors who invested most of the money into SOCIAL-VOUCHER.

INKTOMI got bought out by YAHOO for over $100 million dollars. PARKER was not involved with INKTOMI at this point. There is judgment against PARKER related to PARKER, but PARKER stated it was "nothing" and did not really know what the Judgment was for. PARKER just knows that the judgement was there.

### Use of Email Accounts

PARKER used the email account geraldcparker@gmail.com to communicate with investors. PARKER did not know if he used his email account to communicate with attorneys. PARKER did not send that many emails. PARKER did not use an email account in the name of ▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆ worked at SOCIAL-VOUCHER but PARKER did not consider ▆▆▆▆ to be a big player. PARKER never told ▆▆▆▆ to send emails on his behalf. GRIMALDI would have been the one who asked ▆▆▆▆ to send emails. PARKER did not create the email account stocketinfo@gmail.com.

### Documents Shown to Parker

<u>PARKER was shown a copy of page 7 of the Social Voucher.com, Inc. Business Plan dated October 2013</u>. PARKER was familiar with this document and stated that he did not put this business plan together. GRIMALDI and an individual from Wisconsin named ▆▆▆▆▆▆▆▆▆▆ put together this business plan. PARKER stated that SOCIAL-VOUCHER bought ▆▆▆▆ company. Regarding the section titled "Source and Uses of Funds," PARKER stated that commissions would not be listed here and continued saying "why would they?" When asked if an investor would have invested if the commissions were disclosed in this section, PARKER responded "would you?" PARKER acknowledged that he did not tell SOCIAL-VOUCHER investors that they were paying sales commissions up to 50%. PARKER was sure they did not tell investors about the commissions.

FD-302a (Rev. 5-8-10)

318B-MM-2137495

Continuation of FD-302 of (U) Interview of Gerald C. Parker on 03/11/2020, On 03/11/2020, Page 7 of 10

PARKER was shown a two page document titled Stocket, Inc. Summary 5 Year Forecast, marked draft, and dated 01/08/18. PARKER did not know who drafted this document. PARKER was sure that the company was worth $12.2 billion. GRIMALDI probably drafted this document.

PARKER was shown a one page document titled Cash Flow Model and marked draft. PARKER did not know what this document was. GRIMALDI and ▇▇▇ drafted this document. PARKER was aware that commissions were not disclosed. The plan was to not disclose the commissions. Everyone at SOCIAL-VOUCHER, including GRIMALDI, knew about the plan to not disclose the commissions to investors. When PARKER met GRIMALDI, GRIMALDI and ▇▇▇ already had people raising money. However, the people that they had raising money were terrible and they needed PARKER to be on the paperwork because GRIMALDI and ▇▇▇ could not be on the documents because of their convictions. PARKER had a good name and he decided to get involved because he thought it was a good deal. When GRIMALDI and ▇▇▇ spoke with PARKER, PARKER's main source of income was his social security. PARKER agreed to be the CEO of SOCIAL-VOUCHER because he needed money. PARKER's job was to be the "figurehead." Every investor knew about the Nebraska judgement. When ▇▇▇ financial advisor did his research and found the judgment, the information about his judgment was put out there.

PARKER thought that he probably did not owe that much in taxes to the Internal Revenue Service (IRS). SOCIAL-VOUCHER had no income, but PARKER acknowledged that he did have an income from his employment at SOCIAL-VOUCHER. PARKER had no idea as to why he did not file taxes with the IRS. SOCIAL-VOUCHER did not file taxes with the IRS. If someone asked PARKER why the company did not file taxes, PARKER would say that the company was not making any money and did not have revenues. SOCIAL-VOUCHER did not generate revenues. Instead, the company used investor money to pay for the expenses. SOCIAL-VOUCHER did have an "app" but the app was not generating money.

SOCIAL-VOUCHER paid ▇▇▇ $6,000 a month for NEWBRIDGE to raise money for the company. SOCIAL-VOUCHER owed PARKER $2.5 million dollars and PARKER remembered ▇▇▇ telling PARKER that they could not put this kind of debt in the offering documents. PARKER explained

that the idea was to bring in ▮▮▮▮▮ and have a "clean start" because of all the past issues. The past issues included using unregistered sales representatives to sell the SOCIAL-VOUCHER stock and not disclosing the sales commissions to investors. To have a clean start, SOCIAL-VOUCHER also changed their name to STOCKET.

### Social-Voucher Brokers

When asked if he knew PAUL and CINDY VANDIVIER, PARKER responded that someone brought the VANDIVIER's to work with SOCIAL-VOUCHER. The VANDIVIER's were raising money "out there." PARKER found out later that the VANDIVIER's created their own marketing materials. For every investor, the VANDIVIER's received a sales commission of 35%. Investors wired the money directly to SOCIAL-VOUCHER and the VANDIVIER's were paid after the investor money was received. ▮▮▮▮▮ knew and tracked which investors had invested through the VANDIVIER's or other sales brokers.

PARKER knew PAUL GERACI ("GERACI"). GERACI was one of the "good guys." When the FBI came to the SOCIAL-VOUCHER offices in Boynton Beach, SOCIAL-VOUCHER owed money to GERACI. PARKER thought that they owed GERACI $50,000 that GERACI had loaned them. When asked what GERACI's role in the company was, PARKER stated that GERACI owned a company that sold metals. GERACI also brought SOCIAL-VOUCHER investors from his metals business. GERACI received a sales commission of 50%. PARKER did not remember how involved GERACI was selling the SOCIAL-VOUCHER stock. GERACI had people that pitched the SOCIAL-VOUCHER stock to investors. GERACI knew that PARKER had a $31 million dollar judgment. PARKER also said "everybody knew" about his judgment. After the cease and desist, PARKER's judgement was public and he explained his judgment to GERACI and everyone else. GERACI knew about ▮▮▮▮▮ ▮▮▮▮▮ conviction but did not know about GRIMALDI's conviction. PARKER explained that ▮▮▮▮▮ had a prior conviction for securities fraud going back 12-15 years. PARKER understood that GRIMALDI and ▮▮▮▮▮ had pending restitutions.

▮▮▮▮▮ brought a lot of investors to SOCIAL-VOUCHER and received a sales commission of 35%. GERACI was not a big player at SOCIAL-VOUCHER, but GRIMALDI was.

███████ had the title of in-house counsel but worked for SOCIAL-VOUCHER as a "paralegal" because he could not practice as an attorney because he was not licensed in the State of Florida. PARKER did not know why BOYCE referred himself as general counsel for SOCIAL-VOUCHER. ███ never put himself as a licensed Florida attorney. If ███ did, PARKER never knew. It is not true that ███ was the general counsel of SOCIAL-VOUCHER. Some people did refer to ███ as the in-house counsel. PARKER explained that ███ was not practicing law at SOCIAL-VOUCHER. Instead, ███ worked with attorneys that SOCIAL-VOUCHER used for different things. For example, SOCIAL-VOUCHER worked with attorneys to handle the patent and they also hired a Miami attorney to handle the cease and desist. The patent was a big thing. ███ did the "leg work" for the attorneys. ███ may have drafted security purchase agreement for SOCIAL-VOUCHER. ███ was paid $1,200 to $1,300 a week.

### Photos Shown to Parker

PARKER was shown a number of driver's license photographs from the Florida Driver and Vehicle Information Database (DAVID) which is managed by the Florida Department of Highway Safety and Motor Vehicles. After reviewing each photograph, PARKER provided the following information:

1. ███████, photograph from Florida driver's license ███████. PARKER recognized the female as ███████.
2. PAUL J. GERACI, photograph from Florida driver's license ███████. PARKER indicated that the male on this photo looked like his son - known to the interviewing Agents as BRANDON PARKER.
3. PAUL DOUGLAS VANDIVIER, photograph from Florida driver's license ███████. PARKER recognized the male on the photograph as "DOUG WRIGHT." PARKER then stated that "Doug Wright" was not his real name.
4. CINDY BRITTON VANDIVIER, photograph from Florida driver's license ███████. PARKER recognized the female on the photograph as "Doug's wife."
5. MICHAEL JOHN ASSENZA, photograph from Florida driver's license ███████ PARKER recognized the male on the photograph as Mike Assenza or Grimaldi.
6. ███████, photograph from Florida driver's license ███████. PARKER recognized the male on the photograph as ███████." PARKER stated that ███ used the name "JIM

FD-302a (Rev. 5-8-10)

318B-MM-2137495

Continuation of FD-302 of (U) Interview of Gerald C. Parker on , On 03/11/2020 , Page 10 of 10
03/11/2020

       TURNER" as an alias when he spoke with investors.
7. ▮▮▮▮▮, photograph from Florida driver's license ▮▮▮▮. PARKER recognized the male on the photograph as JOE Last Name Unknown.
8. ▮▮▮ photograph from Florida driver's license ▮▮▮▮. PARKER recognized the male on the photograph as ▮▮▮ PARKER stated that ▮▮ tried to rob a bank.
9. ▮▮▮▮, photograph from Florida driver's license ▮▮ PARKER thought that the male on the photograph was ▮▮▮▮."

PARKER stated that all the individuals he identified from the photographs raised money for SOCIAL-VOUCHER, with the exception of ▮▮▮ PARKER explained that ▮▮▮ got paid by SOCIAL-VOCHUER because he was a founder.

Copies of the documents shown to PARKER, to include the photographs, were electronically attached to the 1A section for review and retrieval purposes.