UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.:21-60101-CR-RS

UNITED STATES OF AMERICA,

   Plaintiff,
vs.

GERALD PARKER,

   Defendant.
_____/

### MOTION FOR DOWNWARD VARIANCE PURSUANT TO 18 USC § 3553

COMES NOW the Defendant, GERALD PARKER, by and through the undersigned attorney, and as grounds therefor would state as follows:

1. Pursuant to the sentencing scheme of 18 U.S.C. § 3553, the Court must first examine the sentencing guidelines and then apply the sentencing factors of 18 U.S.C. § 3553 in order to reach a sentence that is "...sufficient, but not greater than necessary...". In making this ultimate sentencing decision, this Court should consider all of the factors of 18 U.S.C. § 3553(a) in order to impose a sentence that is "reasonable" and not greater then necessary to achieve the sentencing objectives under the statute. The Statute provides the following factors for the Court to consider:

    1) The **nature and history of the offense** and the **history and characteristics of** the Defendant.

2) The need for the sentence imposed;

a) to reflect the seriousness of the offense, to promote respect for the law, and to provide punishment for the offense.

b) to afford adequate deterrence to criminal conduct;

c) to protect the public from further crimes;

d) to provide the Defendant with educational, vocational training or medical care in the most effective manner.

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

(i) issued by the Sentencing Commission pursuant to section 994 (a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994 (p) of title 28); and

(ii) that, except as provided in section 3742 (g), are in effect on the date the defendant is sentenced; or

(B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994 (a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994 (p) of title 28);

(5) any pertinent policy statement—

(A) issued by the Sentencing Commission pursuant to section 994 (a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994 (p) of title 28); and

(B) that, except as provided in section 3742 (g), is in effect on the date the defendant is sentenced. [1]

(6) **the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct**; and

(7) the need to provide restitution to any victims of the offense.

[**EMPHASIS** ADDED]

## I. CHARACTERISTICS OF GERALD PARKER

2. In the case at bar, in order to reach a sentence that is "…sufficient, but not greater than necessary" pursuant to the factors of 18 U.S.C. § 3553, the Court must take a close look at the "**nature and history of the offense**" and the "...**characteristics of the Defendant**…" The best indicator of Mr. Parker's remorsefulness can be found from his actions in this case. Prior to being charged in this case, he was served with a target of an investigation letter in Case No.:20-2120-MJ-Otazo-Reyes. **[Exhibit-A]** Prior to meeting with the agents and prosecutor, the undersigned attorney was appointed to represent him. Instead of invoking his rights, as advised by the undersigned attorney, Mr. Parker took it upon himself to meet with the prosecutor and the agents. During this interview, Mr. Parker gave a truthful, detailed statement of what happened in this case.

3. The undersigned attorney met Mr. Parker soon after being appointed in this case. The undersigned recalls that Mr. Parker was a very articulate and intelligent man who wanted to correct his wrongdoings. It was for this reason that Parker decided to meet with the agents and the prosecutor. It should be noted, that the Gerald Parker that I met soon after being appointed is not the same man that he is today. Because of his brain ailments, and the major stroke that he suffered, Mr.

Parker is now only a shadow of the man that I met a few years ago.

4. Some of the most important "**characteristics**"about GERALD PARKER are as follows:

a)   Gerald Parker is 80 years old;

b)  This is his only criminal conviction;

c) Aside from this case Mr. Parker has always been done honest work;

c)  Mr. Parker lives with his daughter **Cheri Gilson** at 3011 Hough Road, Florence Alabama, 35630;

d) Mr. Parker is mostly dependent ooccasionsn his daughter **Cheri** for all his daily needs;

e) Mr. Parker needs around the clock supervision;

f) He is no longer able to cook. Because of his neurological conditions he forgets the stove is on and has come close to burning down the kitchen on a couple of occasions;

g) Mr. Parker is no longer able to drive;

h) Mr. Parker can no longer leave the house by himself; On one occasion Mr. Parker was taken to a store and got lost;

i) Mr. Parker is not able to manage his financial affairs;

j) Mr. Parker spend most of the time talking to people on Tik Tok. However, he does not relalize that the people that he is talking to are speaking in foreign

realizelanguages.

k) Mr. Parkers continues to soil his adult diapers on a regular basis. Mr. Parker soiled his diapers during his plea colloquy hearing;

l. He has trouble walking and has lost use of one of his hands.

## I(a). HEALTH

5. As the Court is well aware Mr. Parker suffers from multiple severe terminal health conditions. Some of his conditions (not all) are as follows:

a. **White Matter disease.** This disease is a terminal brain condition, where the white matter in the brain is damaged. Mr. Parker's white matter disease is very severe. He was diagnosed with this disease several years ago. This disease is typically fatal within 6 month to 4 years; [See DE:218, 336 & 376 medical records previously filed, Dr. MacDougall, Dr. Mills, Dr. Haber, Dr. Hutchinson, MRI records]

b. Mr. Parker also suffers from **Strokes.** He has suffered at least two major strokes; The most severe stroke was when his mother passed away in February 2021 in Huntsville, Alabama. He also suffers from daily **absenteeism strokes**. At the moment that Mr. Parker gets these strokes his eyes roll back into his head and he his out for a few seconds.

c. Mr. Parker also suffers from an **Aorta Aneurysm**. Unfortunately, the undersigned is very familiar this condition. The undersigned's Mother died

from this condition and on March 5, 2016 the undersigned had to undergo emergency open heart surgery to correct this condition.

**d.** More recently he was diagnosed with **Alzheimers** by Dr. Hutchinson.

**e.** The Court is very familiar with all the Defendant's healths condition. Any prison sentence given to Parker could in a very real way be a death sentence.

6. Gerald Parker requests that the Court consider his medical condition pursuant to 18 U.S.C.§ 3553(a) as other courts have done. *United States v. Martin*, 363 F.3d 25 (1st Cir. 2004) (downward departure affirmed due to defendant suffering from Crohn's disease); *United States v. Gee*, 226 F.3d 885 (7th Cir. 2000) (affirming departure for heart condition); *United States v. Edwards*, 595 F.3d 1004 (9th Cir. 2010) (where defendant convicted of bankruptcy fraud and on probation for prior state conviction for fraud variance upheld where client has diabetes and other illnesses; *United States v. Carmona-Rodriguez*, 2005 WL 840464 (S.D.N;Y., April 11, 2005) (unpub.) (variance approved for 55 year old with no priors because the need for medical care is a factor that must be considered along with the guidelines and defendant suffering from high blood pressure and diabetes); *United States v. McFarlin*, 535 F.3d 808 (8th Cir. 2008) (variance approved in light of defendant's poor health (multiple heart surgeries, etc.) and Section 3553(a)(2)(D) stating that a court may consider the need for medical care when determining a sentence. 18 U.S.C. §3553(a)(2)(D); *United States v. White*,

506 F.3d 635(8th Cir. 2007) (in child pornography case, where guidelines are 108 to 135 months, the court does not err in imposing sentence of 72 months in part because of defendant's health problems which included, diabetes, high blood pressure, weakness in his extremities, and difficulty walking).

7. Pursuant to U.S.S.G. § 5H1.4 Physical Condition, including drug or alcohol dependence or abuse; gambling addiction maybe relevant in determining whether a downward departure is warranted.  U.S.S.G. § 5H1.4 states as follows:

> **Physical condition** or appearance, including physique, **may be relevant in determining whether a departure is warranted, if the condition** or appearance, <u>**individually or in combination with other offender characteristics,** is present **to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to** depart downward;</u> *e.g.*, <u>in the case of a **seriously infirm defendant, home detention may be as efficient**</u> as, and less costly than, imprisonment. [Emphasis added]

   Based on Mr. Parker's physical conditions, individually or combined, clearly demonstrate that he is seriously infirm and that home detention may be more efficient and less costly than imprisonment.

8. Gerald Parker not only met and talked to the agents and the prosecutor in this case, he also  faced the investors and was instrumental in making sure that a receiver was appointed to represent and preserved the interest of the investors.

II. **NATURE AND HISTORY OF THE OFFENSE**:

9.  The "Nature and Circumstances of the Offense" prong of 18 U.S.C. §3553(a)

8

supports a variance from the applicable guideline range. In this case the investors purchased stock in a real company with a real product, contrary to the standard "boiler room" case where individuals are persuaded to invest or spend money on phony, non-existent products, the product that Stocket Corporation was developing was an internet e-commerce platform that combined mobile internet gaming with mobile internet shopping. Users of the platform would build their own retail store and play the role of a store owner. The user would select items from various retail outlets and "stock" their virtual store with a host of different products such as toys, electronics, home furnishings, airline tickets, gift cards, etc.

10. The users would combine virtual game playing with actual retail shopping as the game player would have the option to purchase the product while immersed in the game. This "game commerce" platform allows each user to be a real product re-seller in a virtual game environment while earning commissions as they go. Stocket employs a team of computer programmers that are actively developing the plat form. A patent application takes place on January 4, 2016 and is pending during the time Bhagavad Management sales associates are utilized to solicit investors on behalf of Stocket. The patent is later pursued by a Receiver (appointed by the Palm Beach Circuit Court in a civil suit brought by investors to recover assets) and is granted by the United States Patent Office on April 23, 2019. The patent approval describes the product as, "electronic gaming platforms allowing

users to real-time addition of third-party products services while maintaining persistent links to third-party inventory management computer systems and methods of use thereof. (A copy of patent 10,268,985 is attached as Exhibit B and a copy of the patent assignment history is attached to as Exhibit C).

11. Investors currently hold stock that has significant present value. Importantly, the development of the "App" (and thus the value to investors) is presently ongoing and making significant progress. In the civil suit in Palm Beach Circuit Court referenced above, the investors file a complaint to protect the intellectual property of the Stocket App and to preserve their investment. (See Complaint filed in Case No. 50-2018-CA-011965-XXXX-MB attached Exhibit D).

12. For these reasons related to the "nature and history of the offense" the Defendant submits to the Court that (1) this case is not the standard Southern District of Florida "boiler room" case where investors/victims are swindled into buying non-existent products and items, the individuals in this matter are solicited to invest money in Stocket which was a real start-up company working on a real product developing an "App" containing an internet e-commerce platform that combines mobile internet gaming with mobile internet shopping (with a patent applied for and later granted); (2) that the investors here purchase stock that has

significant present value to the investor in that a Receiver appointed in a civil case brought by investors recently sold the assets of Stocket to TCI Acquisition for $10,932,000.00 (according to state court civil filings) and TCI is in the midst of an Initial Public Offering ("IPO") for potentially and substantially much more (the present value of the stock will be offered at the sentencing hearing in this matter);

III.  **DISPARITY OF SENTENCES**

13. Title 18 U.S.C. §3553(a)(6) requires this Honorable Court, in determining the particular sentence to be imposed, "to consider the need to avoid unwarranted sentence **disparities among defendants with similar records who have been found guilty of similar conduct**." (emphasis added). Co-defendant Michael Assenza receives a sentence of 52 months in this case. [DE:269] While it is understood that he provides substantial assistance to the government in the prosecution of this matter, this fact cannot justify the gross disparity that will result if Mr. Parker is given a bottom of the guideline sentence (of the guideline range prior to the court's ruling on his PSI objection) of **121** months against the backdrop of Mr. Assenza's criminal history and offense conduct in this case. Mr. Azenza was the intellectual author in this case. Azenza was the person that approached Mr. Parker about getting involved in this case. Mr. Assenza, like Mr. Parker was a leader and organizer of the conduct that forms the basis of the prosecution in this case. The factual proffer filed in this case clearly demonstrates this. [DE:127]

14. Mr. Assenza controls a company that receives approximately $2,096,519.00 in

investor funds and arranges to conceal these payments from Social Voucher and Stocket by directing the payments to a company owned and registered to his wife [DE:127] In the plea agreement, the government states and Mr. Assenza agrees that he is responsible for a loss of between $9,500,000.00 and $25,000,000.00. Mr. Assenza purposely chooses to use an alias instead of using his last name (the indictment specifies Michael Grimaldi) in order to conceal a federal felony conviction for Conspiracy to Commit Arson, Securities Fraud and Money Laundering in *United States v. Michael Assenza* [Case No. 05-80066-HURLEY]. Mr. Assenza employs this alias to conceal the fact that he is permanently barred by the Financial Industry Regulatory Authority ("FINRA") from acting as a broker or associating with any broker dealer firm. The alias also allows Mr. Assenza to conceal that he is ordered to pay $5,321,366.00 in restitution and that he owes over $5,000,000.00 in restitution to the individuals he victimizes. [DE:127] In spite of these undeniable realities, Mr. Assenza claims before this Honorable Court that he uses the surname Grimaldi because it is a "family" name. [DE:229]

15. In the Judge Hurley case, Mr. Assenza conspires to firebomb the office of the L.H. Ross Company, a broker dealer of securities registered with the Securities and Exchange Commission. [DE:97 in Case No. 05-80066-HURLEY]  Mr. Assenza is initially charged by way of an indictment on May 20, 2005 (together with Salvatore Puccio and Phillip Polizzotto). The superseding information is filed later on February 8, 2006, and only charges Mr. Assenza. The firebombing is in

retaliation for L.H. Ross severing a franchise agreement with Mr. Azzenza's brokerage firm because the firm engages in fraud. (DE 97, exhibit A at 2). At or around the time the franchise agreement is severed, the owner of L.H. Ross distributes the names of individuals that are clients of Mr. Assenza to brokers at other L. H. Ross franchise offices. The L.H. Ross salesmen tell clients not to do business with Mr. Assenza's firm because of the fraud. Mr. Assenza is irate with L.H. Ross and in a retaliatory spirit, conspires with his co-defendants to firebomb the L.H. Ross office located at 703 East Palmetto Park Road in Boca Raton, Florida.

16. Count one of the superseding information explains how Mr. Assenza devises a plan with his co-conspirators (Salvatore Puccio and Phillip Polizzotto) to maliciously damage and destroy and attempt to damage and destroy by means of fire and explosive materials the offices of L.H. Ross located at 703 East Palmetto Park Road, Boca Raton, Florida in violation of 18 U.S.C. § 844(j)-conspiracy to commit arson. The superseding information describes the manner and means of the conspiracy by relating that on April 1, 2003, at 1:40 a.m. Mr. Assenza and his two co-defendants travel in a black Lexus SUV to 703 E. Palmetto Park Road, Boca Raton, Florida and attempt to break the front window with a hammer at the L.H. Ross office for the purpose of allowing a co-defendant to throw a firebomb into the building. Mr. Assenza and his co-conspirators flee in a Lexus to avoid detection.

17. Count two of the superseding information charges Mr. Assenza with securities

fraud. According to the superseding information, Mr. Assenza knowingly and willfully uses manipulative and deceptive devices and contrivances in connection with the purchase and sale of 12,000 shares of IBID stock to the H and B Fund of South Florida for a purchase price of $75,000.00 using a scheme to defraud by making untrue statements as to material facts and engaging in practices that operated as a fraud and deceit upon others in connection with the purchase and sale of securities.

18. Count three charges Mr. Assenza with money laundering because he receives approximately 40% of the sales price of sale of L. H. Ross stock and kicks back 15%-20% to brokers that sell the stock as their commissions. This commission structure is not disclosed to investors. Mr. Assenza uses his ill-gotten gains to conduct financial transactions that promote money laundering.

19. On February 3, 2006, Mr. Assenza pleads guilty to the three-count superseding information (DE:96 in Case No. 05-80066-HURLEY). On April 27, 2006, Mr. Assenza is sentenced by Judge Hurley to 60 months incarceration to be served concurrently with all three counts. In addition, Judge Hurley imposes a supervised release term of three years and restitution of $5,321,366.00. (See DE 120, Judgment and Commitment entered in Case No. 05-80066-HURLEY). Next, on July 30, 2008, the government files a Motion to Reduce Sentence (DE 153 in 05-80066-HURLEY). In that pleading, the government states that they are

requesting that the Court reduce Mr. Assenza's sentence "based on his cooperation in several matters." (DE 153:1). Mr. Assenza files a Defendant's Rule 35 Memorandum wherein he objects to the government's proposed recommendation of a six (6) month reduction in his sentence. (DE 160 in 05-80066-HURLEY).

20. On August 28, 2008, Judge Hurley conducts a hearing pursuant to the government's Rule 35 sentence reduction request (DE 161 in Case No. 05-80066-HURLEY) and reduces Assenza's sentence to 48 months incarceration. (See DE 162, Amended Judgment Order dated August 28, 2008) . It is noteworthy that at the hearing, the government references the original sentencing hearing and relates that Assenza's original sentencing guideline range is 108-135 months incarceration.

21. The transcript also reveals more details of Mr. Assenza's crime which include the fact that he and co-defendant Polizzotto enter the window of the L.H. Ross Offices where Mr. Assenza breaks the window and Polizzotto is to throw the explosive device into the building. It is also revealed that Puccio drives the crew to the job. Judge Hurly notes the seriousness of the crime describing it as one involving strong-arm tactics with organized crime overtones. In this spirit, Mr. Assenza's lawyer shares that Puccio is a "made man" member of organized crime.

22. All of the foregoing demonstrates the that Mr. Assenza is a three time convicted felon that wiggles his way out of a potential 11 year prison sentence in 2006(and again in 2008) for the retaliatory firebombing of a corporate office

(with a member of organized crime), and for securities fraud and money laundering; who thereafter is the organizer and leader of the organized scheme to defraud in the instant case where he defrauds over 300 individuals of over $20,000,000.00 dollars by making false statements and disseminating false and misleading financial statements and false and misleading marketing materials; who attempts to conceal all of his chicanery by having his ill-gotten gains deposited into corporate accounts in his wife's name; and who uses a fake name to conceal that he is a three-time convicted felon.

23. 18 U.S.C. §3553(a)(6) requires this Court, in determining the particular sentence to be imposed, "to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Post Booker sentencing courts have done just that and sentenced defendants below the guideline range, consistent with §3553(a)(6), to remedy such disparity. See *United States v. United States v. Martin*, 520 F.3d 87 (1st Cir. 2008) (judge imposes 144 months instead of applying career offender range of months for cocaine base distribution conspiracy rather than follow career offender guideline range of 262-327 in part because of perceived need to avoid disparity relative to co-conspirators' sentencing); *United States v. Lazenby*, 439 F.3d 928, 934 (8th Cir. 2006) (recognizing that extreme disparities in the sentences imposed on co-conspirators could "fail to promote respect for the law"); *Cullen v. United States*, 194 F.3d 401, 408 (2d Cir. 1999) (sentencing court could plausibly conclude

that extremely divergent sentences would undermine the accepted notion that similar conduct should be punished in a somewhat similar manner); *United States v. Smart*, 500 F.3d 800 (10th Cir. 2008) (where defendant convicted after trial of inducing a minor to engage in sexually explicit conduct for the purpose of producing videotapes in violation of 18 U.S.C. §2251(a), and guidelines 168 to 210 months, sentence to 120 months affirmed because the defendant is less culpable than co-defendant who receives 120 months even though co-defendant pled guilty); *United States v. Krutsinger*, 449 F.3d 827 (8th Cir. 2006) (where defendant convicted of obstruction of justice regarding drug conspiracy and where government sought 60 months based on cooperation, judge properly imposes below guideline sentence of 20 months because of disparity with other defendants that attempt to address the disparity in sentences between two nearly identically situated individuals who committed the same crime in the same conspiracy); *United States v. Tzoc-Sierra*, 387 F.3d 978 (9th Cir. 2004) (Appellate court in drug case affirms district court's downward departure from range of 46-57 months to 36 months on basis of disparity of sentence received by codefendants); *United States v. Ray*, 920 F.2d 562 (9th Cir. 1990), amended, 930 F.2d 1368, 1372-73 (9th Cir. 1991) ("disparity is said to be one of the most important evils the guidelines are intended to cure").

24. Unless this Court varies from the guidelines (prior to ruling on the PSI objections), Mr. Parker may receive a sentence of more than 72 months more than

Mr. Assenza. This would be in spite of the aforementioned conduct in this case and Mr. Assenza's troubling prior record. Notably, 18 U.S.C. §3553(a)(6) requires the Court to assess the conduct and the prior record of the co-defendants in analyzing disparity. Here, the conduct of Assenza and Parker are similar. However, Mr. Assenza was the intellectual author of the scheem. In addition, unlike Parker, Mr. Assenza is a three-time convicted felon, who committed a previous fraud crime that involves the violent firebombing of a competitor that Mr. Assenza is irate with and that United States District Court Judge T.K. Daniel Hurley states is an offense characterizing strong arm tactics with organized crime overtones. No amount of cooperation can change these facts and justify a within guidelines sentence for Mr. Parker. A guideline sentence for Mr. Parker, who has no prior criminal records, will result in an unwarranted sentencing disparity in derogation of 18 U.S.C. § 3553(a)(6). Moreover, it will not provide just punishment for Mr. Parker or promote respect for the law.

Respectfully submitted,

**Israel Jose Encinosa, Esq.**
9100 S. Dadeland Blvd., Suite 1500
Miami, Florida 33156
Tel. (786) 497-7241
Fax.(786) 404-3070

By:/s/ Israel Jose Encinosa, Esq.
Israel Jose Encinosa
F.B.N.: 435007

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished electronically by the CM/ECF system to all parties, this 28th day of March, 2023.

/s/Israel Jose Encinosa, Esq.
Israel Jose Encinosa
